## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| CORY S. BARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 4:12-CV-74 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff, Cory S. Barrett. For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g).

BACKGROUND

On May 24, 2010, claimant, Cory S. Barrett ("Barrett" or "claimant") applied for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. On May 25, 2010, Barrett applied for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq.

Barrett alleged that his disability began on February 5, 2010. The Social Security Administration denied his initial application and also denied his claims on reconsideration. Barrett appeared on December 2, 2011, with counsel, at a hearing before Administrative Law Judge William E. Sampson ("ALJ Sampson" or "ALJ"). The ALJ heard testimony from Barrett as well as from an impartial Vocational Expert ("VE"), Leonard M. Fisher. On December 12, 2011, ALJ Sampson denied Barrett's DIB and SSI claims, finding Barrett not disabled as defined by the Social Security Act. (Tr. 10-22).

Barrett requested that the Appeals Council review the ALJ's decision and the request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a) (2005). Barrett has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 1383(c).


DISCUSSION

Barrett was born August 22, 1971. (Tr. 20). He was 40 years old when the ALJ rendered his decision, and 38 years old at the time of onset. (Tr. 16). Barrett graduated from high school and had past relevant work as a cable installer, a satellite installer, and a dispatcher. (Tr. 16, 34, 165). Barrett alleges the

following impairments: back injury, symptoms associated with spinal fusion surgery, anxiety, panic attacks, and depression. (Tr. 164).

Barrett underwent back surgery in 2000. (Tr. 35, 238). In late 2009 or early 2010, Barrett began experiencing pain in his back again. (Tr. 237-39, 356, 448). On January 8, 2010, Dr. John Gorup of the Indiana Spine Center examined Barrett. (Tr. 350-51). Barrett reported that he had been having low back and leg pain for 6 weeks, that the pain was constant, and that the pain was worse when he stands, bends, lifts or walks. (Tr. 350). He rated his pain at 8 out of 10. (Tr. 350). Examination showed nerve tension signs and diminished reflexes in his lower extremities. (Tr. 351). Dr. Gorup ordered an MRI and diagnosed recurrent L5-S1 disc herniation, acquired lumbar spinal stenosis, lumbar ridiculopathy, and degenerative disc disease of the lumbar spine. (Tr. 266, 268, 350-51).

On January 12, 2010, Dr. Gorup recommended Barrett undergo a posterior lumbar interbody fusion procedures at L5-S1 due to severe symptoms and findings. (Tr. 349). Barrett underwent the surgery on February 8, 2010. (Tr. 264). When he was released from the hospital on February 11, 2010, his pain was well controlled on oral pain medication. (Tr. 352).

Following the surgery, Barrett continued to feel moderate to severe back pain, often radiating down his left leg and numbing his left foot. (Tr. 358-59). Dr. Robert Bigler performed a series of

three steroid injections in May, June, and July of 2010 to relieve pain and determine its source. (Tr. 280, 297, 313). In May of 2010, Barrett reported no improvement in his pain with the back surgery and that his pain was actually worse. In June, Barrett reported a moderate to severe amount of discomfort and pain. (Tr. 346). On July 22, 2010, Barrett saw Dr. Gorup and reported complete pain relief for two days following a spinal injection. (Tr. 344). Dr. Gorup planned to see Barrett in two months, and if x-rays revealed that his fusion was well consolidated, he would proceed with removal of Barrett's hardware. (Tr. 344).

In August of 2010, Barrett described his pain to Dr. Bigler as constant, sharp, shooting, stabbing and aching. (Tr. 419). He indicated that the pain was relieved by lying down and pain medication. (Tr. 419). He further indicated that the pain has continued since his back surgery in February of 2010, and he rated the pain as a 10 out of 10. (Tr. 419). In September of 2010, Barrett again described his pain as constant, shooting, stabbing and aching, and rated it as 8 out of 10. (Tr. 415). He indicated that the pain is exacerbated by sitting, standing, walking, bending, or lying flat. (Tr. 415). On September 30, 2010, Dr. Gorup released Barrett from his care and indicated he was solidly fused, but he noted that Barrett reported ongoing numbness in his right leg. (Tr. 381).

On October 09, 2010, Barrett underwent a medical examination

with the State Disability Determination Services medical consultative examiner, Luella Bangura, M.D. (Tr. 368-70). Upon examination, Barrett's gait was antalgic and he had a normal station. (Tr. 370). He was able to walk on his toes with difficulty but unable to walk on his heels. (*Id.*). He could squat, but he could not bend over more than 30 percent. (*Id.*). There was tenderness to palpation of the spine, but no evidence of inflammation, effusion, swelling, muscle weakness, or atrophy. (*Id.*). Dr. Bangura found that the straight-leg raising sign was positive on the right side. (*Id.*).

On November 9, 2010, Dr. J. Sands, an agency physician, completed a physical residual functional capacity assessment form for Barrett. (Tr. 405-12). Dr. Sands believed that the medical records show that Barrett could lift 20 pounds occasionally and 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday, and was not limited in his ability to push and/or pull. (Tr. 406). He further indicated that Barrett could only occasionally climb, balance, stoop, kneel, crouch or crawl. (Tr. 407).

Barrett saw Dr. Bigler consistently throughout 2011. On March 8, 2011, when Barrett saw Dr. Bigler, he rated his pain as a 7 out of 10. (Tr. 464-66). When Barrett saw Dr. Bigler on April 12, 2011, he rated his pain as 8 out of 10 and described the pain as constant, sharp, nagging, shooting, piercing, stabbing, aching and

dull.  (Tr. 460-62).  He felt that Flexeril was not helping him and that his pain was getting worse overall.  (Tr. 460).  The pain was worst in his lower back, but extended into his shoulders, left hand and fingers, thoracic spine, hips, buttocks, posterior and lateral thigh, lower leg, calf, and foot.  (Tr. 460).

When Barrett saw Dr. Bigler on May 10, 2011, he reported pain as constant, sharp, nagging, shooting, piercing, stabbing, aching and dull, and he rated his pain at 6 out of 10.  (Tr. 456-58). Records indicated he was using a transcutaneous electrical nerve stimulation ("TENS") unit for pain management at the time and that it was helping.  (Tr. 456).  Dr. Bigler indicated Barrett should follow up in four months, but Barrett saw Dr. Bigler just a month later, on June 06, 2011.  (Tr. 458, 452-54).  At this visit, Barrett reported constant, sharp, nagging, shooting, piercing, stabbing and aching pain that he rated as an 8 out of 10.  (Tr. 452).  Barrett saw Dr. Bigler again on September 21, 2011, and described his pain as sharp, dull, shooting, stabbing, nagging, piercing, and aching.  (Tr. 448-50).  He further indicated that the pain radiated to his buttock, thigh, leg and foot, and that the pain was worsened by standing, walking, bending and lying flat. (Tr. 448).  The pain was relieved by medication, sitting, standing and lying down, and Barrett got good relief from pain medication. (Tr. 448).  On November 22, 2011, Barrett saw Dr. Bigler yet again. (Tr. 519-21).  He rated his pain at 7 out of 10 and described his

pain as constant, sharp, nagging, shooting, piercing, stabbing and dull. (Tr. 519). Dr. Bigler prescribed Cymbalta for Barrett. (Tr. 521).

With regards to Barrett's mental impairments, on January 1, 2010, Dr. Aldo Buonanno performed a mental status examination on Barrett. (Tr. 364-66). Dr. Buonanno diagnosed panic disorder, depressive disorder, and alcohol dependence in remission, and assigned a GAF of 57.[1] (Tr. 365-66). Dr. Buonanno noted that "Barrett's problems seem to be more physical than anything else" and "[h]e is still in pain and has no medical insurance and is currently on no medications." (Tr. 366).

Notes from American Health Network dated October 14, 2010, indicated that Barrett continued to suffer from depression and anxiety and that his back surgery was considered a failed surgery. (Tr. 372). He was not taking his medications because he could not afford them. (Tr. 372).

On October 27, 2010, Dr. F. Kladder, Ph.D., completed a psychiatric review technique form in which he indicated that the medical evidence demonstrated Barrett suffered from both depression and panic disorders, but that those disorders were not so severe that they met the listings. (Tr. 391-404). He further found that

---

[1] GAF is a scoring system for measuring an individual's overall functional capacity. A GAF of 57 would represent moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR,* 32-34 (4th ed. 2000).

the medical records suggested that Barrett suffered only mild restrictions of activities of daily living, only mild difficulties in maintaining social functioning, and only mild difficulties in maintaining concentration, persistence or pace. (Tr. 401). Dr. Kladder indicated that Barrett's psychiatric impairments did not appear severe. (Tr. 403). Dr. Kladder's assessment was affirmed by Dr. B. Randal Horton on October 27, 2010. (Tr. 443).

In October of 2011, Barrett sought outpatient treatment at Wabash Valley Alliance, Inc. (Tr. 511-17). Following assessment, he was diagnosed with Panic Disorder without agoraphobia, major depression, recurrent, moderate, full remission, and alcohol dependence, full remission. (Tr. 517). His GAF was assessed at 45.[2] (Tr. 511). A treatment plan was developed for Barrett and included as a goal that Barrett would "report 1 panic attack or less each week (instead of several times a week)." (Tr. 513).

At the hearing, Barrett testified that, following surgery in February of 2010, he has had constant pain, often shooting down his left leg, and numbness in his left foot. (Tr. 36). He stated that he takes OxyContin and Oxycodone for pain management, and it relieves a portion of the pain; without it he would not be able to function. (Tr. 37). Barrett estimated he could stand or walk for

---

[2] A GAF of 45 would include serious symptoms of suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR,* 32-34 (4th ed. 2000).

a maximum of 15 minutes at a time. (Tr. 37). He also estimated that he could sit for ten to fifteen minutes before he needs to shift around to relieve the pain. (Tr. 37-38). He can only sleep for about two hours at a time and, as a result, naps during the day. (Tr. 38).

Barrett lives with his parents and has four children that he sees one night a week and every other weekend. (Tr. 39, 173). Barrett's parents take care of the shopping, cooking, cleaning, and other household chores. (Tr. 38-38). Barrett indicated in a functional report that he can only fix simple meals, such as cereal or sandwiches, because standing to cook exacerbates his pain. (Tr. 174). He does not usually drive and when he does he states he can only drive short distances. (Tr. 175). Barrett enjoys reading and watching sports or movies. (Tr. 176). He does not often leave the house to socialize or go out. (Tr. 177).


Review of Commissioners Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining

whether substantial evidence exists, the Court shall examine the record in its entirety but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:  Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to step 2.

Step 2:  Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to step 3.

Step 3:  Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's listing of impairments, as

described in 20 C.F.R. § 404 Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to step 4.

Step 4:    Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to step 5, where the burden of proof shifts to the Commissioner.

Step 5:    Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); see also *Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Barrett suffers from a severe impairment: lumbar degenerative disc disease status post fusion L5-S1. (Tr. 12). The ALJ further found that Barrett did not meet or medically equal one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)(the "listings"). (Tr. 15). ALJ Sampson then determined that Barrett has the following residual functional capacity ("RFC"):

less than sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a). Particularly, the claimant can lift 10 pounds occasionally and up to 10 pounds frequently. He can stand and/or walk up to 2 hours in an 8-hour workday and sit for up to 6 hours in an 8-hour workday. He shall not climb ladders, ropes or scaffolds, but may climb ramps and stairs. He can occasionally balance, stoop, kneel, crouch and crawl.

(Tr. 16).

Relying on the testimony of the VE, the ALJ further found

that, considering the Barrett's age, education, work experience, and residual functional capacity, he is capable of performing past relevant work as a dispatcher and, in the alternative, he could perform other jobs that exist in significant numbers in the national economy. (Tr. 20-21). Thus, Barrett's claim failed at steps four and five of the sequential analysis, and the ALJ found that Barrett had not been under a disability, as defined in the Social Security Act, from February 5, 2010, through the date of his decision. (Tr. 21).

Barrett argues that the ALJ erred in several ways. He asserts that the ALJ erred in finding that he does not meet or equal listing 1.04(A). Barrett further argues that the ALJ's decision contains numerous material misstatements of the evidence and that, as a result, the ALJ has not formed a logical bridge from the medical evidence to his conclusions. Barrett also argues that the ALJ erred in discounting the opinion of Dr. Bangura, a consultative examiner hired by the Commissioner.


Listing 1.04(A)

Barrett first argues that the ALJ erred in determining that his impairments neither meet nor equal listing 1.04(A).[3] To meet

---

[3] Barrett makes two additional arguments that the ALJ erred at step 3, but those arguments lack merit and are addressed only cursorily here.

Barret argues that "[t]he ALJ erred by failing to accurately, and thereby failed to adequately, consider and weigh the opinions of his treating physicians and other acceptable medical sources." (DE 15 at 6). Barrett never tells the Court which treating physician's opinion he feels the ALJ failed to

listing 1.04, a claimant must have a disorder of the spine
resulting in compromise of a nerve root or the spinal cord
evidenced by "nerve root compression characterized by neuro-
anatomic distribution of pain, limitation of motion of the spine,
motor loss (atrophy with associated muscle weakness or muscle
weakness) accompanied by sensory or reflex loss and, if there is
involvement of the lower back, positive straight-leg raising test
(sitting and supine)."  20 C.F.R. § 404, Subpart P, App. 1, §
1.04(A).  At step three of the analysis, the burden falls upon the
claimant to provide medical evidence showing that his impairment
meets or equals all criteria set forth in a listing.  *Ribaudo v.
Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

    The ALJ's findings with regard to step three, are as follows:

> The undersigned examined and considered all
> listed impairments in 20 CFR Part 404, Subpart
> P, Appendix 1 with specific attention to the
> following listing: 1.04 (Disorders of the

---

properly weigh.  Since no treating physician has opined that Barrett meets or
equals listing 1.04, the Court is somewhat unclear what point Barrett is
trying to make. The ALJ did not determine that any treating physician's
opinion was entitled to less than controlling weight.  The ALJ did note (not
in assessing step three, but in determining Barrett's RFC) that "there is no
treating source or other opinion on file providing limitations which support a
finding of disability." (Tr. 20).  Barrett has argued that certain portions
of the record (including records by treating physicians) support a finding
that the listing is met, and the Court will consider those citations, but the
Court is not convinced that the treating physician rule was violated here.
    Barrett also argues that the ALJ's step three finding is based on a
material misstatement of the record.  The ALJ states in his opinion that Mr.
Barrett obtained "complete relief" from pain following injections, but the
record establishes that the "complete relief" that Barrett referenced only
lasted for two days.  (Tr. 18-19, 344).  This issue will be discussed further
in the context of Barrett's other arguments, but the ALJ's step three finding
does not appear to be based on an inaccurate belief that the injections
offered Barrett long-term complete relief from pain.

spine). The undersigned noted the Disability
Determination Service (DDS) medical examiners
disposed of this case after assessing the
claimant's residual functional capacity, which
meant no listing was met or equaled, in their
opinion.

The claimant's impairment failed to meet the
listing for 1.04 (Disorders of the spine),
because the record, consistent with the
findings below, does not demonstrate
compromise of a nerve root (including the
cauda equina) or the spinal cord with
additional findings of: (A) Evidence of nerve
root compression characterized by neruo-
anatomic distribution of pain, limitation of
motion of the spine, motor loss (atrophy with
associated muscle weakness or muscle weakness)
accompanied by sensory or reflex loss and
positive straight-leg raising or; (B) Spinal
arachnoiditis or; (C) Lumbar spinal stenosis
resulting in pseudoclaudication. (See 20 CFR
Part 404 Subpart P, Appendix 1, § 1.04)

The undersigned concluded the medical evidence
did not demonstrate the claimant's impairments
rose to the level of listing level severity,
and that no acceptable medical source had
mentioned findings equivalent in severity to
the criteria of any listed impairment,
individually or in combination.

(Tr. 15).

According to the Commissioner, its decision should be upheld

because the ALJ relied upon state agency physicians who had

reviewed the record and concluded that Barrett did not meet or

equal any listed impairment. (DE 22 at 7-8). The Commissioner

cites to four Disability Determination and Transmittal ("DDT")

forms and the reports those forms rely upon. (Tr. 55-58; 391-404;

405-12). As a general proposition, the Commissioner is correct.

*See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004)(noting that DDT forms stating that a claimant is not disabled conclusively establish that a physician designated by the Commissioner has considered the question of medical equivalence at the initial and reconsideration levels, and that these forms are substantial evidence supporting a finding that a claimant does not meet or equal a listing); *Pope v. Shalala*, 998 F.2d 473,481 (7th Cir. 1993)(noting that a signed DDT form "is proof that a physician designated by the Secretary has considered the equivalency question, and the ALJ may rely upon the physician's opinion to determine eligibility."). But, the Seventh Circuit, when faced with a similar argument based on *Scheck*, made it clear that an "ALJ may rely solely on opinions given in Disability Determination and Trasmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record..." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).

In this case, the DDT forms cite to two reports which shed little to no light on whether Barrett meets or equals listing 1.04. A psychiatric review technique form by Dr. Kladder is referenced in which Dr. Kladder finds that neither listing 12.04 (Affective disorders) nor listing 12.05 (anxiety disorders) were met, but Barrett has not argued that he meets or equals those listing. (Tr. 391-404). A Physical Residual Functional Capacity Assessment by Dr. Sands is referenced, too, but it makes no mention of the

listings whatsoever. (Tr. 405-12). The DDT forms also reference opinions by Drs. Horton and Ruiz, but these doctor's merely affirmed the opinions of Drs. Klatter and Sands. (Tr. 57-58, 443).

In contrast, Barrett argues that the record supports a finding that listing 1.04(A) is equaled. He cites to the following evidence:

> a. The ongoing pain as previously discussed;
> b. Limitation of motion of the spine, which includes significantly restricted bending (bending limited to touching thighs)(Tr. 415);
> c. Limited extension and flexion of his spine (Tr. 415);
> d. Reflex loss. See pain management doctor's records (Tr. 414-442, Tr. 447-474 and Tr. 519-521F);
> e. Positive straight leg raising test on consultative exam (Tr. 379);
> f. Not able to walk on heels due to pain (Tr. 379);
> g. Not able to bend forward more than 30 degrees. (Tr. 379); and
> h. Neuroanatomic distribution of pain with pain across the back, into the buttocks and down the leg. (Tr. 414-442, Tr. 447-474 and Tr. 519-521F).

(DE 15 at 9-10). Although Barrett offered no explanation of why these citations demonstrate the listing is met, the record does demonstrate that there is at least some evidence that suggests each of the criteria of listing 1.04 may be met.

First, there is evidence that Barrett experienced neuro-anatomic distribution of pain. He experienced pain across his back, in his bilateral hip and buttocks, legs, particularly the bilateral posterior thigh and bilateral lower leg in the calf.

(Tr. 415, 419, 448, 452, 456, 460, 464). Barrett's records demonstrate limitations of motion of the spine. (Tr. 453, 457, 461, 465). Barrett's records also demonstrate that he experienced loss of reflexes. (Tr. 454, 458, 462, 465). There is some evidence of motor loss, too, in the form of an inability to walk on his heels due to pain.[4] (Tr. 370). Finally, although several straight leg tests were negative, Barrett had a positive straight leg test. (Tr. 370, 416, 420, 454, 458).

The above evidence does not mandate a finding that listing 1.04(A) was met, but it is some evidence that may support a finding that the listing was met. It is at least enough evidence that the ALJ had an obligation to do more than merely note that DDS medical examiners found no listing was met and then parrot back the language of the listing. Accordingly, the case must be remanded. On remand, the ALJ is instructed to revisit step three and, if he determines that Barrett does not meet listing 1.04, offer a detailed explanation that allows meaningful review of his decision.

Misrepresentations of the Evidence

Barrett also argues that the ALJ relied on several misstatements in the record (31 to be precise) and that, as a

---

[4] Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor less. 20 C.F.R. Part 404, Subpart P, App. 1, 1.00E1; *see also Kastner v. Astrue*, 697 F.3d 642, 650 (7th Cir. 2012); *Ribaudo*, 458 F.3d at 584.

-17-

result of those misstatements, there is not an accurate and logical bridge between the evidence and the ALJ's findings regarding Barrett's credibility, activities of daily living, or RFC.  The ALJ is not required to address every piece of evidence but must build an accurate and logical bridge between the evidence and the result. *Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir. 2009); *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000).  Where, however, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," this Court cannot uphold the ALJ's determination. *Shramek*, 226 F.3d at 811 (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *Groves v. Apfel,* 148 F.3d 809, 811 (7th Cir. 1998)).

Many of Barrett's alleged misrepresentations are immaterial, such as the ALJ's statement that Barrett can cook without clarifying that he only cooks simple meals.  This Court will not discuss each and every one of Barrett's allegations of a misrepresentation by the ALJ.  However, Barrett's argument is not completely without merit and the most troubling of his alleged misrepresentations are addressed below.

First, Barrett believes that the ALJ inaccurately characterized the pain from his impairment when the ALJ said that Barrett had "complete relief" from pain following an epidural injection.  (DE #15, at 8-9).  The medical record more accurately states that Barrett reported to his doctors that he had "two days

worth of complete relief" from the pain following the injection. (Tr. 344). When first referring to the epidural injections in his opinion, the ALJ stated that Barrett experienced "complete relief" from the pain for two days (Tr. 18), but later in his opinion the ALJ simply states that following the injections Barrett had "complete relief" from pain with no reference to the fact that the relief was short-lived. (Tr. 19).

The context in which this occurred in important. In determining that Dr. Bangura's opinion was entitled to little weight, the ALJ noted that Dr. Bangura's opinion was inconsistent with the record. The ALJ cited several items to support this claim, including the following:

> He admitted that sitting and his pain medication alleviated the pain and after his hardware injection, he obtained "complete relief."

(Tr. 19). The ALJ also referenced Barrett's "complete relief" from pain in finding that Barrett was not credible:

> The claimant's treatment records also do not support the severity of his physical impairments. Although the evidence shows that, the claimant has been diagnosed with the above physical impairments, the claimant condition has appeared to have improved to the point that he reports "complete relief" after obtain a hardware injection, and that he is able to stand, walk and/or sit up to one to two hours at a time.

(Tr. 19-20)(grammatical errors in original).

While the ALJ's opinion does show that, at one point, he

understood that Barrett's complete pain relief lasted only two days, the above analysis makes no sense if the pain relief lasted only two days.

In addition, the ALJ stated that in August of 2010, Barrett "described his pain as a '2' on a pain scale of 1 to 10, with 10 being the worst." (Tr. 18). In fact, the record states that on the date of examination Barrett described his pain as a 10 out of 10. (Tr. 419-22). The ALJ's reference to 2 of 10 likely comes from the following notes by Dr. Bigler:

> He has continued pain from his back surgery in 2/10. The back pain is across the back. There is pain in the right hip and/or buttocks. Pain is in the right posterior lateral thigh. Pain is along the right lower leg in the calf. Foot pain is located in the toes. Depression and anxiety symptoms are increased. Medications are becoming less effective.

(Tr. 419). It is clear that the reference to "2/10" was a reference to when Barrett had surgery in February of 2010. (Tr. 422). In fact, Barrett's lowest pain rating from 2010-2011 was a 6 out of 10 in May 2011. (Tr. 456). Prior to that date, Barrett's records show he had not rated his pain lower than an 8 out of 10. (Tr. 415, 419, 448, 460).

Also troubling is the ALJ's reference to Barrett's non-compliance with medical treatment in his credibility determination:

> The claimant's activities of daily living, social functioning, and non-compliance of medical treatment and improvement of examination findings are inconsistent with his

impairments.

(Tr. 19).  The ALJ's reference to "non-compliance" is apparently a reference to his failure to take medication.  But, the record has more than one reference to Barrett's inability to afford treatment at various times.  A note from October of 2010 reveals that Barrett was homeless, living between three houses, felt stressed, and was not taking his medications because he was unable to afford them. (Tr. 372).  Another provider noted that Barrett "is still in pain and has no medical insurance and is currently on no medication." (Tr. 366).  The ALJ acknowledged earlier in the opinion that, in October of 2010, Barrett had reported that he stopped taking his medications because he could not afford them. (Tr. 13).  Despite acknowledging the reason that Barrett did not take medication, he used that failure as a reason to discredit Barrett's testimony without any explanation of why Barrett's reason for not taking medication was unsatisfactory.  An ALJ should not rely on a lack of treatment to find a claimant not credible without inquiring into the reason for the lack of treatment.  SSR 96-7p.[5]    Here, the

_____

[5] SSR 96-7p provides that:

> ... the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to

-21-

reason was clear from the record, and the ALJ should have explained why Barrett's failure to take medication was a relevant factor despite the indication that the reason was an inability to afford the medications.

Lastly, the Court notes that the ALJ used the "sit and squirm" test to substantiate his decision that Barrett is not disabled. The ALJ noted the fact that Barrett was able to "sit during the entire 45 minute hearing without difficulty and walked with a normal gait, thus, suggesting that he is capable of performing at least sedentary work." (Tr. 19). The ALJ's use of the "sit and squirm" test to make his determination is frowned upon in the Seventh Circuit. *See Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) ("We doubt the probative value of any evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort."). However, the Court does not automatically reverse where this test is used; instead, the Court considers whether the

seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. . . .

SSR 96-7p.

test was used properly in conjunction with other credibility evidence. *Id.* Here, when the "sit and squirm" test is used in conjunction with so many other errors in interpreting the evidence, its usefulness is highly questionable at best.

The above-mentioned errors, when considered together, demonstrate that the ALJ's decision failed to build the sort of accurate and logical bridge between the evidence and the ALJ's decision, as required. *Simila*, 573 F.3d at 516. Accordingly, this case must be remanded for further proceedings.

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g).

DATED: March 11, 2014                    /s/RUDY LOZANO, Judge
                                         United State District Court